[Cite as *State v. Salti*, 2019-Ohio-149.]

# Court of Appeals of Ohio

EIGHT APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 106834

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**RAED A. SALTI**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART;
REVERSED IN PART

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-620106-A

**BEFORE:** E.T. Gallagher, J., Kilbane, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 17, 2019

**ATTORNEYS FOR APPELLANT**

Mark Stanton
Cuyahoga County Public Defender

BY:    Frank Cavallo
Assistant Public Defender
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY:    Holly Welsh
          Hannah Smith
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Raed Salti, appeals his convictions and claims the following

five errors:

> 1.  The trial court committed plain error by permitting the state to proceed on an indictment that should have been severed under Crim.R. 14, prejudicing appellant's right to a fair trial.
>
> 2.  Appellant was denied the effective assistance of counsel in his trial.
>
> 3.  The cumulative errors committed during the trial deprived appellant of a fair trial.
>
> 4.  There was insufficient evidence produced at trial to support a finding of guilt on all counts.

5.  The appellant was found guilty against the manifest weight of the evidence.

{¶2} Finding some merit to the appeal, we affirm the trial court's judgment in part and reverse it part.

## I.  Facts and Procedural History

{¶3} Salti was charged with twelve counts of rape in violation of R.C. 2907.02(A)(2), nine counts of kidnapping in violation of R.C. 2905.01(A)(4), seven counts of extortion in violation of R.C. 2905.11(A)(5), one count of compelling prostitution in violation of R.C. 2907.21(A)(2)(a), and one count of gross sexual imposition in violation of R.C. 2907.05(A)(1).  The rape charges included repeat violent offender and sexually violent predator specifications.  The state dismissed one count of rape and one count of kidnapping before trial.

{¶4} The indictment, which alleged offenses against eight victims over a period of several years, resulted from an investigation that began in March 2016 when K.K.[1] reported a rape to the Garfield Heights police.  K.K. testified at trial that she met someone named "Becky" on a social media website called MeetMe.  K.K. never met Becky in person or spoke with her over the phone, but conversed with her via text messaging.  After several exchanges, Becky told K.K. that she knew someone who could offer K.K. a job in a convenience store called Max & Grady's in Garfield Heights.  The store owner, identified as Rae, called K.K. to discuss the position and agreed to meet K.K. in person for an interview.

{¶5} Two days later, Rae, later identified as Raed Salti, picked K.K. up from her home and took her to the store for the interview.  When they arrived, another man, whom K.K. believed to

---

[1]  We refer to victims by their initials in accordance with this court's policy to not disclose the identities of sexual assault victims.

be an employee, gave her an alcoholic beverage even though she was underage. K.K. was 19 years old at the time of these events. (Tr. 295.)

{¶6} During a tour of the store, Salti took K.K. into a storage room in the basement where he placed a belt around her neck and forced her to give him oral sex. He threatened to kill her if she refused, ejaculated in her mouth, and forced her to swallow his semen. (Tr. 289.) He told her to call him "Daddy," and threatened that she "better be a good girl" or he would come to her house and tell her parents what she had done.

{¶7} After the rape, Salti told her to close her eyes. When she opened them, a second man opened her mouth and forced her to perform oral sex on him. Salti took photographs and a videorecording of K.K. performing oral sex on himself and the other man. He also forced K.K. to remove the top of her dress and smile while he took a topless photograph of her.

{¶8} After the assaults, Salti gave K.K. another alcoholic beverage, told her to drink it, and warned there would be consequences if she failed to comply with his orders. Salti also demanded that K.K. smoke marijuana with him and his coworkers. Afterwards, Salti took K.K. to a strip club, but the bouncer would not admit her because she was underage. Thereafter, one of Salti's associates dropped K.K. off in her neighborhood, and she walked home. K.K. continued to communicate with Salti via text messaging in the ensuing days because he threatened her, and she did not want to endanger herself or her family.

{¶9} K.K. tried to believe the incident never occurred, that it was a horrible dream, and that she would wake up and everything would be okay. But K.K. could not deny the assault occurred because she received a text message, purportedly from Becky, asking: "How's my sister slut?" (Tr. 314.) She received a second text from Becky containing a photograph of herself

performing oral sex on the second man in the storage room. The photograph was accompanied by a message that said: "That's so bad of you." (Tr. 314.)

{¶10} K.K. also received threats from Salti. Salti asked "[D]o I have to get you in trouble with Mommy and Daddy in order to grab your attention?" (Tr. 316.) In another message, he warned: "If you don't stay down on me, I promise to tell your parents how bad their daughter has been." In yet another message, he stated: "Happy St. Patrick's Day, you fucking bitch. I'll stop being mean to you if you remember to say good morning or good night or even hi, Daddy." (Tr. 317, 321.) The text messages were admitted into evidence at trial.

{¶11} When asked why K.K. did not immediately report the rape to her parents or the police, she explained that she was scared, did not know how to tell someone, and did not want to believe the incident really happened. (Tr. 328.) However, K.K.'s sister, who noticed a change in K.K.'s demeanor following the "interview," continually questioned K.K. about it. Consequently, K.K. told her sister and parents about the rape five days later, and her parents reported the rape to the Garfield Heights police. The police investigated the allegations and executed a search warrant of Max & Grady's where detectives seized, among other things, three cell phones, which led to the discovery of other victims. (Tr. 727, 729.)

{¶12} K.K. blocked Becky and Salti's phone numbers on her phone. However, a few days later, K.K. received a text from Salti containing his picture and a message that said: "Daddy misses his daughter." (Tr. 323.) The message was sent from a new phone number. (Tr. 322.) K.K. took a picture of the text and photograph and emailed it to Detective Carl Biegacki of the Garfield Heights Police Department, who used the photograph to identify Salti as the perpetrator.

{¶13} Biegacki testified that he interviewed Salti, who voluntarily unlocked two of the phones seized during the search. Biegacki downloaded photographs from the phones onto a

computer before sending the phones to the Internet Crimes Against Children task force ("ICAC") for professional analysis. (Tr. 748.) Biegacki compared the photographs he downloaded with other extractions made by ICAC and was able to identify additional victims. Biegacki explained:

> There were so many pictures on these phones, it's impossible to tell who all of these girls are. Some didn't have face shots, some just had shots of just their midsections and whatever, so I was fortunate enough to get some that actually had their phone numbers and some of them had their names written on certain texts or whatever. So running them through [OHLEG and LEADS],[2] I was able to determine where they live.

(Tr. 729.)

{¶14} Biegacki interviewed at least five additional victims depicted on Salti's phones, and they repeated similar stories:

> Each girl or each lady that I talked to there were common threads in almost all the girls. The name Becky kept coming up. Some of the girls actually thought they were talking to Becky. Most of them did anyways. But really, it was Mr. Salti. And what would happen is they would send him nude photos thinking it was going to be Becky, then he would turn around and say, you know, I'm going to show everybody these pictures. I'm going to send them to your family, send them to your school, try to get these girls to have sex with him, he would do that; or threaten to send people to their house[s] to hurt them or their famil[ies].

(Tr. 731.) Some of the women identified from Salti's phone were not interested in talking to Biegacki, but others were relieved to finally report what happened to them. (Tr. 746-747.) Three of the victims identified on Salti's phone testified at trial in addition to other victims.

{¶15} Jason Howell, a digital forensic examiner assigned to ICAC, examined two of Salti's phones; a Samsung Galaxy Mini smartphone and a Samsung Galaxy S5 smartphone. The Galaxy Mini had four registered accounts on MeetMe, one Kik Messaging account under the name Jordan Davis 220, and a Snapchat instant messaging account with the username HolyBeckz1. Howell explained that other users on Snapchat would see the name HolyBeckz1

and "[t]hat's who they would think they were talking to." (Tr. 671.) The Galaxy Mini contained 5,559 images, many of which were taken for a social media application that was rebranded as MeetMe. (Tr. 672.)

{¶16} The Galaxy S5 contained 49 registered user accounts, including three MeetMe accounts with three different user names as well as accounts on Kik Messenger, Craigslist, Snapchat, Facebook Messenger, Instagram, Talktone, and others. Howell explained that applications such as Talktone allow a person to use a different phone number than the number associated with the phone and make calls through the internet. (Tr. 685.) When asked about his examination of the SD card, the portable digital storage device in the Galaxy S5, Howell replied:

> There were several images and videos on the SD card. A lot of those images contained self-taken pictures from the suspect, commonly referred to as selfies, and there were a lot of different images of unknown women; again, a lot of selfies of these unknown women. Some are clothed, some unclothed. There are videos of the women just in general and also some of them are performing sex acts and so on and so forth.

(Tr. 676.) According to Howell, there were also text messages stored on the phone that were carried out through conventional texting, including the conversations between Salti and K.K. regarding potential employment at Max & Grady's. (Tr. 688-690.)

{¶17} After the investigation had been pending for several months, C.L., who was not depicted on Salti's phone, contacted Biegacki and reported that Salti had raped her as well. (Tr. 732.) C.L. testified that although Salti raped her in 2010, she did not report the rape to authorities until after Salti was incarcerated pending trial in 2017 because she was afraid he would retaliate with violence against her if she reported it. (Tr. 374.)

---

2    OHLEG and LEADS are law enforcement databases.

{¶18} C.L. met Salti through Craigslist in 2009 when she was 19 years old. After dating for a few months, C.L. decided to end the relationship because Salti was "very controlling." (Tr. 360.) Salti constantly accused C.L. of cheating on him and texted her throughout the day. He often showed up unannounced at the credit union where she worked to ask: "[W]here have you been?" and "[W]hy aren't you calling me?" Her telephone at work was "constantly ringing." (Tr. 361.) C.L. testified that Salti also hacked into her personal email and went through her phone whenever it was unlocked to find people he could use to manipulate her. (Tr. 361.)

{¶19} Salti refused to accept C.L.'s decision to end the relationship and continued to text and call her and show up without notice at her home and workplace. Shortly after breaking off the relationship, C.L. went to Salti's apartment to retrieve a cat she had rescued because she was afraid Salti would hurt it. When C.L. insisted that the relationship was over, Salti became aggressive and vaginally raped her.

{¶20} After the rape, C.L. ran from Salti's apartment to her home, a few blocks away. Salti followed her in his car, screaming at her and telling people, who happened to be walking down the street, that C.L. was a prostitute. (Tr. 369.) While she was running, C.L. called the police and remained on the phone with the dispatcher until she made it safely home. The police arrived a short time later and knocked on her door, but she was too shaken and afraid to come out and tell them what happened. (Tr. 370.) As previously stated, C.L. did not report the incident to police until after Salti was arrested in connection with the rape of K.K. several years later. (Tr. 374.)

{¶21} In the meanwhile, Salti continued to stalk C.L. for the next six or seven years. (Tr. 372.) Salti made friends with C.L.'s friends on Facebook and asked them to contact her on his behalf. (Tr. 372.) C.L. testified that, in the intervening years, she also received friend requests

on Facebook from several unknown people, including individuals who called themselves "Becky Carson" and "A.R."[3]   (Tr. 376-378.)

{¶22} During the course of the investigation, Biegacki learned that the name "Becky," which Salti had repeatedly used to lure his victims, referred to a real person, who was another one of Salti's victims.[4]   Becky testified that she first met Salti in 2011, when she was 16 years old. They met at a gas station, and Salti asked if she smoked marijuana.   Becky replied: "Yes," and Salti offered to sell her drugs.   She took his phone number and later texted him.   Thereafter, they smoked marijuana together, started dating, and engaged in a consensual sexual relationship. Becky also sent Salti nude photos of herself.

{¶23} Becky testified that during her interactions with Salti, she babysat for a woman while the woman was prostituting for Salti.  (Tr. 564.)   Salti pressured Becky to prostitute for him as well, but she refused.   The relationship between Becky and Salti ended when Becky's mother discovered it.   Before they broke up, however, Salti had gained access to Becky's Facebook account and changed the password.   (Tr. 567.)   After they broke up, Salti started sending messages to Becky's friends on Facebook, telling them that Becky was a prostitute and a drug user.   (Tr. 567.)

{¶24} Becky went to Salti's house to try to reclaim her Facebook account.   Salti told Becky that he would release her Facebook account if she agreed to prostitute for him.   (Tr. 568.) Becky refused and attempted to leave the house, but Salti pushed her into a bedroom, put his hand

---

[3]   A.R. was another victim identified from information on Salti's phones.   (Tr. 740-741.)

[4]   Although Becky was one of Salti's victims, we are not using her initials because Salti used the name and persona of "Becky" to communicate with other victims, and Becky Carson is not her real name.

over her mouth, and vaginally raped her. (Tr. 570-571.) When asked why Becky did not call the police or tell anyone what happened, Becky explained:

> I didn't feel like they would believe me because we had had a consensual relationship and I also felt like they wouldn't understand like the extent of what he's been doing. I was also afraid of him. He had a lot of hold over me.

(Tr. 572.) Salti threatened to send the nude pictures he had of Becky to her family and friends. He also threatened Becky's boyfriend and her job. (Tr. 576.)

{¶25} In the years after the rape, Becky created a new Facebook account and was contacted by people she believed to be Salti:

> I * * * had weird people try to add me on Facebook. He has a very interesting way of writing to where I suspected they were him, also saying unusual things to me, and I just always felt it was him messing with me. I've had other accounts as well as his account messaging me.
>
> * * *
>
> There was [sic] messages from like black men asking me about prostituting. There was [sic] messages from a woman named [A.R.]. I always suspected — I don't know if he had access to her Facebook account, but, I don't know, her asking me for like drugs, other stuff, trying to talk to me about him.

(Tr. 754-575.) Becky testified that she never had an account with the name "Holy Becks," even though her photo was used as the profile picture on an account registered by that name on Salti's phone. (Tr. 580.)

{¶26} Biegacki identified J.C.1 and G.E. as two more victims captured on Salti's phones. They met each other on MeetMe and were friends before either of them met Salti. Curiously, J.C.1 and G.E. both met Salti on MeetMe, independently of each other on different dates. J.C.1 testified that in 2014, when she was still in high school, she met someone named Shawn on MeetMe. After several conversations, J.C.1 sent nude pictures of herself to Shawn, and decided

to meet him in person. Before their meeting, Shawn told J.C.1 that he liked to be called "Daddy." (Tr. 510.)

{¶27} Shawn and J.C.1 arranged a date, and Shawn picked J.C.1 up from G.E.'s house. But Shawn was not alone; there were two other people in the car. Nevertheless, J.C.1 got in the backseat with Shawn, and they drove to a Mobile Boost store some distance away. Throughout the ride, Shawn tried to get J.C.1 to give him oral sex, but J.C.1 refused because there were other people in the car. When they reached the Mobile Boost store, Shawn escorted J.C.1 to a backroom where J.C.1 gave him oral sex.

{¶28} J.C.1 testified that the oral sex was consensual at first, but changed when Shawn became forceful and put his hands on her throat. She was scared and told him to stop, but he held her head down and forced her to perform oral sex on him until he ejaculated. (Tr. 533, 549.) After it was over, "Shawn" gave J.C.1 a Sprite, and his associate drove her back to G.E.'s house. J.C.1 told G.E. what happened, still believing that the man who raped her was named Shawn. (Tr. 518.)

{¶29} Sometime later, G.E. met someone named Becky on MeetMe. G.E. viewed Becky's profile picture, thought she looked cute, and sent her a message. (Tr. 466.) Becky responded, and they had several conversations via text messaging. G.E. sent Becky a topless photo of herself, and they decided to meet in person. They agreed to meet at a local Walgreens and go together from there to a Days Inn Hotel in Lakewood, Ohio. (Tr. 467.)

{¶30} G.E., who was 18 years old, went to the Walgreens as planned and got into the SUV she expected to find, but Becky was not in the car. Instead, there were three men, including Salti, who was seated in the back next to G.E. Salti told G.E. that he was one of Becky's friends and that Becky was going to meet them at the hotel. (Tr. 469.) G.E. and Salti checked into the hotel,

and the other two men drove away. (Tr. 470.) G.E. and Salti had a few drinks and engaged in consensual sex. They spent the night together, exchanged phone numbers, and Salti drove her home the next morning. G.E. later sent a message to Becky asking her why she never came to the hotel.

{¶31} Although G.E. was still interested in Becky, she agreed to meet Salti again at Walgreens. (Tr. 473.) However, as she was walking close to the Walgreens, a man grabbed her from behind and pushed her against the wall of the Walgreens building. Although the man's head was covered, G.E. recognized him as Salti by his voice and distinctive hands. (Tr. 474.) Salti held a knife to G.E.'s throat and threatened to kill her if she made any noise. He ordered her to keep her hands on the wall while he vaginally raped her. (Tr. 475-477.) When it was over, Salti told her: "I thought that would be a fantasy, something you might enjoy." (Tr. 477.)

{¶32} Salti and G.E. continued to communicate via text messaging after the rape because G.E. was afraid Salti would hurt her if she ignored him. (Tr. 481.) According to G.E., Salti called and texted her "constantly," and threatened "to have * * * black guys come to [her] house and rape [her] and kill [her]." (Tr. 482.)

{¶33} G.E. did not report the rape to police because she felt she would be "blamed" since she agreed to meet Salti at the Walgreens. (Tr. 480.) However, she told J.C.1 about Salti, the consensual sex, the subsequent rape, and the ensuing threats. G.E. showed J.C.1 photos of Salti, and J.C.1 recognized him as "Shawn." (Tr. 518.)

{¶34} Following these events, J.C.1 and G.E. received numerous threats from "Becky's" phone number. After some time had passed, J.C.1 and G.E. received a phone call from a man using Becky's phone number. They negotiated with the man, whom they believed to be Salti's

associate, in an effort to bring an end to the threats. They ultimately agreed to give the man oral sex in exchange for being left alone, and the man promised not to touch them. (Tr. 528.)

{¶35} J.C.1 and G.E. met the man, who was wearing a mask, behind the nearby Walgreens. They recognized the man as Salti by his voice, and took turns performing oral sex on him. Salti took a knife from his pocket, dragged it over G.E.'s face, and told her: "I think Becky wants me to cut you." (Tr. 487.) When J.C.1 asked the man to stop touching her, he took her hand and moved it up to his waistband where she felt a gun. G.E. also saw the gun in Salti's belt when he made J.C.1 touch it. Salti demanded that G.E. turn around and take off her pants, but J.C.1 stepped in to prevent a vaginal rape by performing more oral sex on Salti. After this event, neither G.E. nor J.C.1 heard from Salti again. (Tr. 534.)

{¶36} A.M. testified that she met Salti through a friend in 2009, when she was 15 years old. Shortly after their first meeting, A.M. encountered Salti a second time when he happened to drive by her house. Salti encouraged A.M. to engage in prostitution and she prostituted for him on three separate occasions when she was 16 years old. (Tr. 408, 451.) Salti also forced A.M. to give him oral sex, videotaped it, and threatened to expose the video to her family and friends on Facebook if she did not have sex with him and prostitute for him. (Tr. 411-412.) Consequently, A.M. had sex with Salti 10 to 15 times when she was between the ages of 15 and 18 years old. (Tr. 410, 412.)

{¶37} Salti communicated with A.M. through Facebook, sometimes under the name "Becky" and sometimes under his own name. But A.M. did not know anyone named Becky. (Tr. 412.) Some of the messages alluded to prostitution and asked if A.M. wanted "to come make some money?" (Tr. 416.)

**{¶38}** A.M. never reported the rapes to the police because she was "too afraid" and "ashamed." (Tr. 415.) However, the Garfield Heights police contacted her after they found her information on Salti's phones. (Tr. 418, 729.) When asked why she agreed to speak with the police after so many years, she explained:

> Because they came to me and it was, I guess, a little easier, and I found out there were like other girls that had been through the same thing, so I guess it made me feel a little bit more comfortable.

(Tr. 418.)

**{¶39}** J.F. knew Becky in high school and later reconnected with her on a social media application called Plentyoffish. (Tr. 756.) Although they never spoke over the phone or met in person, J.F. believed she was corresponding with the girl named Becky that she knew from high school because she recognized Becky in the profile picture. J.F. was interested in having a romantic relationship with Becky and sent her some nude photos of herself. The correspondence with Becky later changed when Becky told J.F. that she had to perform oral sex on other people before they could meet in person. (Tr. 757.) J.F. refused, and the communications with Becky stopped.

**{¶40}** A year or two later, J.F. received communication from Salti on Facebook and Snapchat in which he accused J.F. of helping Becky steal drugs from him. (Tr. 758.) Shortly thereafter, Salti started sending J.F. messages containing the nude photos J.F. had previously sent to "Becky," and he threatened to publish the nude pictures on the internet if she refused to have sex with him. (Tr. 759.)

**{¶41}** Meanwhile, J.F. was also contacted by A.R. on Facebook. (Tr. 760.) A.R. told J.F. that if she "d[id] sexual things with her," Salti would leave her alone. (Tr. 761.) J.F.

testified that she considered complying with this request because she was afraid of Salti and wanted him to leave her alone. (Tr. 762.)

{¶42} J.C.2 was another victim, who was not depicted on Salti's phones. She testified that she lives in Connecticut, but came to Ohio in 2015 for work. (Tr. 601-602.) J.C.2 worked for a business services brokerage company that sold a variety of business-related services to independently owned companies. One day, in August 2015, J.C.2 met Salti at Max & Grady's and gave him a sales pitch. Salti appeared interested in the services and asked relevant questions. He invited J.C.2 into the basement to escape the noise of the store so they could further discuss various products. While they were talking, Salti took J.C.2's hand and placed it on his penis. Their meeting ended shortly thereafter, and J.C.2 left the store.

{¶43} J.C.2 and Salti had exchanged business cards, and Salti called and texted J.C.2 later that evening to inquire whether she was coming back to discuss some of the options she had mentioned. J.C.2 returned to Max & Grady's a few days later hoping to make a sale and found herself again in the basement with Salti. (Tr. 622-623.) As J.C.2 was presenting information, Salti started masturbating in front of her. (Tr. 627.) J.C.2 starting walking toward the door, but Salti reached out his arm and blocked her passage. (Tr. 630.) J.C.2 did not resist because she feared Salti would become aggressive.

{¶44} Fortunately, someone from the store called Salti to come upstairs and J.C.2 escaped. J.C.2 went directly to the Garfield Heights Police Department and reported the two incidents. J.C.2 worked with police to try to obtain an admission from Salti by returning to the store wearing a wire. She also sent him text messages with police guidance, but Salti never made any incriminating statements, and the investigation stalled until Biegacki discovered Salti's other victims. (Tr. 658-659, 732.)

**{¶45}** The jury found Salti guilty of eight counts of rape, eight counts of kidnapping, six counts of extortion, one count of compelling prostitution, and one count of gross sexual imposition, but not guilty of three of the counts of rape. The jury also found that victims on four of the kidnapping counts were under 18 years old when the offenses occurred. Following a separate hearing, the trial court found Salti guilty of the attendant repeat violent offender and sexually violent predator specifications.

**{¶46}** After merging allied offenses, the trial court sentenced Salti to 11 years on the rape conviction alleged in Count 1[5] of the indictment, plus ten years to life on the sexually violent predator specification, to be served concurrent to each other but consecutive to the sentence imposed on Count 2. The trial court sentenced Salti to 11 years on the rape conviction alleged in Count 2, plus ten years to life on the sexually violent predator specification. Salti was sentenced to 11 years on each of the remaining rape convictions alleged in Counts 5, 14, 16, 19, 21, and 26, plus ten years to life on the attendant sexually violent predator specifications on those counts, to be served concurrent to one another and all other counts.

**{¶47}** On the extortion charge alleged in Count 4, the court sentenced Salti to three years, to be served consecutive to the sentences imposed on Counts 1 and 2. Salti was sentenced to three years on Counts 7, 12, 18, 23, 25, and 28, which alleged kidnapping, rape, compelling prostitution, and extortion, to be served concurrent to each other and all other counts. On Count 24, another kidnapping charge, Salti was sentenced to 18 months to be served concurrent to all other counts. Thus, the court sentenced Salti to an aggregate 25 years to life in prison with a mandatory period of postrelease control. Salti now appeals his convictions.

---

[5] We refer to the count numbers used by the court in its judgment entries as opposed to the renumbered counts in the indictment because the trial court's judgments follow the original numbering.

## I.  Law and Argument

### A.  Joinder

{¶48} In the first assignment of error, Salti argues the trial court erred by allowing the state to proceed on an indictment that should have been severed under Crim.R. 14. He contends the failure to sever the counts against the multiple victims deprived him of a fair trial.

{¶49} Salti did not request a severance in the trial court and, therefore, has forfeited all but plain error.  *State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 90.  Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  In a plain error analysis, the appellant bears the burden on demonstrating that, but for the error, the outcome of the trial would clearly have been different.  *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶17.

{¶50} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."  Ohio law favors the joinder of multiple offenses if the requirements of Crim.R. 8(A) are met because it conserves judicial resources, lessens the risk of incongruous results in successive trials, and reduces the inconvenience to the witnesses. *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

{¶51} Nevertheless, if it appears that a defendant is prejudiced by a joinder of multiple offenses, the trial court may grant a severance under Crim.R. 14.  *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 94.  If a defendant claims he was prejudiced by the joinder, the state may refute the defendant's claim of prejudice in one of two ways.  First, the state may show that evidence of the other offenses would have been admissible as "other acts"

under Evid.R. 404(B) if the offenses had been tried separately. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). Alternatively, the state need only show that the evidence of each of the offenses joined at trial is simple and direct. *Id.*, citing *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980). Evidence is simple and direct if the jury would be "capable of segregating the proof required for each offense." *State v. Mills*, 62 Ohio St.3d 357, 362, 582 N.E.2d 972 (1992).

{¶52} The multiple offenses charged in the indictment in this case are of the same or similar character and demonstrate a common scheme or plan. Six victims were allegedly raped by Salti and subsequently extorted by him through the use of social media. A seventh victim was not raped, but Salti allegedly extorted this victim in the same manner as other others; by threatening to publish nude photos of her on the internet. Although the eighth victim was not raped or extorted on social media, the sexual nature of the offense, i.e., gross sexual imposition, committed against her was similar in character to the rapes perpetrated on the other victims. Therefore, the multiple charges involving the eight victims were properly charged together under Crim.R. 8(A).

{¶53} Further, Salti cannot demonstrate he was prejudiced by the joinder of multiple counts related to the different victims because evidence of the separate offenses was simple and direct and would have been admissible under Evid.R. 404(B) if the offenses had been severed and tried separately. Under Evid.R. 404(B), evidence of other "bad acts" is admissible to establish, among other things, the defendant's identity, preparation, or plan. Evidence of other "bad acts" establishing a defendant's modus operandi may also be used to identify the defendant.

{¶54} Other acts demonstrate a modus operandi if they provide "a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be

used to identify the defendant as the perpetrator." *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). In other words, the other acts evidence must be related to, and share, common features with each of the crimes charged beyond just the elements of the offenses. *Id*.; *see also State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 199 (A defendant's admission that he previously murdered witnesses to silence them is not admissible as a modus operandi to prove that he murdered a witness in the case at bar because the evidence did not "establish a distinctive behavioral fingerprint.").

{¶55} To qualify as a modus operandi, there must be some unique pattern tending to show that the crimes were committed by the same person. For example, in *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, the Ohio Supreme Court held that the trial court properly joined multiple offenses for trial because the crimes shared a similar modus operandi, and the evidence of the separate crimes would have been admissible in separate trials had the offenses been tried separately. The defendant in *Sapp* cut the pants off his victims in a distinctive fashion, using a knife to cut the pants at the seams. The defendant also murdered or attempted to murder his victims, using blunt objects to inflict violence to his victims' heads. Thus, the defendant's pattern of behavior left his unique "signature" as identifying evidence.

{¶56} Similarly, in *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, the testimony of a prior rape victim was properly admitted to show the defendant's "behavioral footprint." In both cases, the defendant preyed on women who had just had an argument with their boyfriends in a bar, and the defendant offered to take them home, but instead took them to a secluded area where he used a weapon to sexually assault them. *Id*. at ¶ 105. Although the

defendant murdered only the second victim, the pattern of conduct involved in both offenses was sufficiently unique to identify the defendant as the perpetrator of both offenses.[6]  *Id.*

{¶57} Salti lured his victims using false identities on social media websites.  Many times sexual predators use social media to bait their victims.  However, Salti repeatedly used his victims' identities to manipulate other victims.  He took Becky's Facebook password and used her identity as an alias to induce young women to send him nude pictures of themselves that he would then use to extort and control them.  K.K. testified that she met "Becky" on MeetMe, and "Becky" introduced her to Salti.  (Tr. 280-281, 289.)  After Salti raped J.C.1, he sent her threatening messages from "Becky."  (Tr. 466.)  As Detective Biegacki stated, the name "Becky" kept coming up and was a "common thread."  (Tr. 729.)

{¶58} G.E. also met "Becky" on MeetMe and attempted to meet her in person, but met Salti instead.  (Tr. 466.)  J.F. met "Becky" on Plentyoffish and sent "her" nude pictures of herself, which Salti subsequently used to threaten her.  (Tr. 758-759.)  And Salti contacted both A.M. and C.L. on Facebook as "Becky."  Thus, Salti used Becky's identity to communicate with six of the eight victims, and the seventh victim was Becky herself.  Therefore, the use of Becky's persona was a modus operandi that could be used to identify Salti as the perpetrator on the counts pertaining to those victims.

{¶59} However, Salti used the name and identity of another individual, A.R., to communicate with several victims.  The real Becky knew A.R. as someone who engaged in prostitution for Salti.  (Tr. 575.)  A.M. met Salti through her friend, A.R.  (Tr. 404.)  J.F. testified that she was contacted by A.R., who told her that Salti would stop threatening to expose

---

[6]  There was evidence that the defendant murdered the second woman because she resisted, whereas, the first victim surrendered.

nude pictures of her if she performed certain sexual acts with A.R. (Tr. 761.) C.L. also testified that she received messages from both "Becky" and "A.R."

{¶60} Salti also told his victims to call him "Daddy," referred to himself as "Daddy," and sometimes called his victims "daughter." Before meeting J.C.1 for sex, Salti told her to call him "Daddy," and she eventually called him "Daddy" out of fear. (Tr. 283, 289.) He liked to call J.C.1 "daddy's little girl" and told K.K. that "Daddy misses his daughter." (Tr. 323, 510.) Thus, the evidence related to each of these victims involved a unique pattern of behavior that could be used to identify Salti as the perpetrator of each of them. Therefore, evidence related to the crimes against these victims would have been admissible as "other acts" evidence under Evid.R. 404(B) if the multiple counts of the indictment had been severed.

{¶61} J.C.2 is the only victim who did not communicate with one of Salti's aliases. And, J.C.2 never heard Salti call himself "Daddy" or express a desire that she call him "Daddy." Therefore, the offenses Salti committed against J.C.2 would not be admissible as a modus operandi under Evid.R. 404(B).

{¶62} Nevertheless, the evidence of Salti's crimes against J.C.2 was not prejudicial to Salti under Crim.R. 14 because it was simple and direct. *Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293; *Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980). As previously stated, evidence is simple and direct if the jury would be "capable of segregating the proof required for each offense." *Mills*, 62 Ohio St.3d 357, 362, 582 N.E.2d 972 (1992).

{¶63} Salti was convicted of gross sexual imposition in Count 24 of the indictment, which alleged that Salti compelled J.C.2 to touch his "Genital Area" by force or threat of force. As previously stated, J.C.2's testimony differed from the other victims' testimony because she never communicated with Salti on social media, never referred to Salti as "Daddy," and never

communicated with any of the other victims. The offense occurred spontaneously while J.C.2 was making a sales call on Max & Grady's. The differences between this offense and the others, which involved prior planning, is remarkable, and the jury would easily distinguish the proof required for this offense from the evidence offered to prove the other offenses.

{¶64} Therefore, Salti cannot establish that he was prejudiced by the joinder of multiple offenses in a single trial. Accordingly, the first assignment of error is overruled.

### B. Ineffective Assistance of Counsel

{¶65} In the second assignment of error, Salti claims his constitutional right to the effective assistance of counsel was violated because counsel failed to file a motion to sever multiple counts, failed to object to inadmissible evidence, failed to voir dire a potentially biased juror, and failed to make a meaningful motion for acquittal under Crim.R. 29. He claims the combined effect of these deficiencies deprived him of a fair trial.

{¶66} To establish a claim for ineffective assistance of counsel, the appellant must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶67} Salti argues his trial counsel was ineffective because she failed to file a pretrial motion to sever the multiple counts in the indictment. However, as previously explained, the multiple counts were properly charged together under Crim.R. 8(A) because they were of the same

or similar character and shared a common scheme or plan. Even if counsel had filed a motion to sever the counts, Salti could not have demonstrated the prejudice necessary to warrant a severance under Crim.R. 14 because the evidence was simple and direct, and the evidence would have been admissible under Evid.R. 404(B) in separate trials if the offenses had been severed. Therefore, counsel was not deficient in deciding not to file a motion to sever multiple counts.

{¶68} Salti also argues his trial counsel was ineffective because she failed to object to evidence of the firearms and drug paraphernalia seized during the search of Max & Grady's. He contends the evidence of firearms and drug paraphernalia was unfairly prejudicial because he was not on trial for drug or firearm violations.

{¶69} However, relevant evidence is generally admissible. Evid.R. 402. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Nevertheless, a trial court must exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403.

{¶70} In *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, the court defined "undue prejudice" as "'that quality of evidence which might result in an improper basis for a jury decision'" because it "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.'" *Id*. at ¶ 36, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). The *Creech* court further explained that the probative value of evidence is evaluated by comparing it to evidentiary alternatives:

> Probative value is measured partially by the relative scarcity of evidence on the same issue. * * * That is, if the state offers evidence for which there is an evidentiary alternative that has substantially similar or greater probative value but

is less prejudicial, the probative value of the state's evidence must be discounted. The danger of unfair prejudice is then weighed against this reduced probative value.

*Id.* at ¶ 22, citing *Old Chief v. United States*, 519 U.S. 172, 185, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

{¶71} The firearm evidence adduced at trial consisted of two photographs; one of a gun and the other of Salti posing with a gun. These pictures, which established that Salti was in possession of a gun, were relevant because they corroborated the testimony of J.C.1 and G.E., who testified that Salti threatened them with a gun when he raped them behind the Walgreens store. The evidence was also relevant to establish the force elements of the rape and kidnapping charges related to these victims. Although both victims testified that Salti had a gun during the rapes, we cannot say that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice since the photographs were necessary to corroborate the victims' testimony and provided proof of the force element of the rape charges.

{¶72} Evidence of drug paraphernalia was also relevant because it corroborated K.K.'s testimony that Salti made her smoke marijuana after he raped her. (Tr. 291.) Further, Becky testified that she started her relationship with Salti because he offered to sell her drugs, and J.F. testified that Salti accused her of stealing drugs from him. (Tr. 563, 758.) The photographs of drug paraphernalia corroborated the testimony of these witnesses. Therefore, the probative value of the drug paraphernalia evidence was not outweighed by the danger of unfair prejudice.

{¶73} Salti nevertheless claims his trial counsel was ineffective because she failed to object to prior "bad acts" evidence. He contends his trial counsel should have objected to C.L.'s repeated references to the fact that Salti was incarcerated. However, C.L. did not refer to any prior incarceration. Rather, she testified that she did not feel safe reporting Salti to the police for

rape until after she learned he was incarcerated in connection with the instant case. (Tr. 374.) Therefore, counsel was not ineffective for failing to object to prior "bad acts" evidence since there was no evidence of prior "bad acts."

{¶74} Salti further asserts his trial counsel was ineffective for failing to object to hearsay evidence and speculation offered by Detective Biegacki. He contends Biegacki should not have been allowed to repeat statements made by the victims during police interviews.

{¶75} Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). Thus, an out-of-court statement by a witness or victim offered to prove the matters asserted therein is hearsay. *State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167. However, the hearsay rule does not apply to out-of-court statements that explain the course of a police investigation. *State v. Mallory*, 8th Dist. Cuyahoga No. 106052, 2018-Ohio-1846, ¶ 18, citing *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980); *State v. Warren*, 8th Dist. Cuyahoga No. 83823, 2004-Ohio-5599, ¶ 46.

{¶76} Detective Biegacki repeated information he learned from the victims during investigatory interviews. Some of Biegacki's testimony explained how the police used information provided by the victims to further the investigation. However, Salti objects to Biegacki's description of how many victims sent nude photographs of themselves to someone they thought was Becky, but was really Salti, and Salti used the photographs to extort the victims. Some of Biegacki's testimony explained how he came to discover that Becky was another one of Salti's victims. However, to the extent that Biegacki's testimony was merely a retelling of the victims's stories, the testimony was admitted in error and should have been excluded. We nevertheless find the error harmless because Biegacki's testimony was cumulative to the testimony provided by the victims themselves.

{¶77} Salti further asserts that Biegacki's recitation of the victims' statements was prejudicial because he lumped them together and repeatedly referred to them as "they." He contends Biegacki's second-hand accounts of multiple victims "as if they were one," was confusing and ambiguous. However, the jury heard testimony from each of the victims and, therefore, could easily distinguish the offenses committed against each one individually. Although the summary of the victims' statements was admitted in error, the collective description of the victims' similar experiences was harmless. The outcome of the trial would not have been different even if counsel had objected to Biegacki's testimony and his testimony had been excluded.

{¶78} Salti argues his trial counsel was also ineffective because she failed to voir dire alternate juror No. 1. During the course of the trial, alternate juror No. 1 disclosed that she went to high school with A.M. (Tr. 429.) Consequently, the court held a separate voir dire hearing in which the court inquired into alternate juror No. 1's relationship to A.M. Alternate juror No. 1 informed the parties and the court that A.M. was a grade lower than alternate juror No. 1 in school and that alternate juror No. 1 never socialized with A.M. When asked if alternate juror No. 1 had "any independent experiences or information that would weigh on how to assess [A.M.]'s credibility or not?" Alternate juror No. 1 responded: "Absolutely not, no." (Tr. 430.)

{¶79} The state asked only one question during the special voir dire, and requested clarification as to which witness she recognized. (Tr. 430.) Defense counsel did not ask any questions, and Salti now claims his trial counsel was deficient for failing to voir dire this juror. However, given that the juror had no relationship with A.M. other than recognizing her from the same school, we cannot say defense counsel was ineffective for not questioning the juror further. Moreover, Salti fails to explain how counsel's failure to question the juror prejudiced his defense.

{¶80} Finally, Salti argues his trial counsel was ineffective because she failed to make a meaningful motion for acquittal under Crim.R. 29. He contends his trial counsel did little more than state the standard of proof. However, the record shows that counsel's motion prompted the court to review the evidence and the merits of the motion. Moreover, deciding to argue the merits broadly as opposed to making specific arguments relative to each and every count is a matter of sound trial strategy. More precise arguments about specific counts could cause the state to request an amendment to the indictment that, if granted, could prevent reversal of some counts due to insufficiency on appeal. Thus, counsel's performance was not deficient for failing to make a more detailed argument as to each and every count of the indictment.

{¶81} Therefore, because Salti has failed to establish that his trial counsel's performance prejudiced his defense, the second assignment of error is overruled.

## C. Cumulative Error

{¶82} In the third assignment of error, Salti argues the cumulative effect of the errors that occurred during the trial deprived him of a fair trial.

{¶83} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent." *State v. Allen*, 8th Dist. Cuyahoga No. 102395, 2016-Ohio-102, ¶ 53, citing *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

{¶84} Salti does not identify any additional errors within this assignment of error that were not raised in the second assignment of error. And, as discussed, the only claimed error in the

second assigned error with any merit was the admission of hearsay during Detective Biegacki's testimony, but that error was harmless.

**{¶85}** Therefore, the cumulative error doctrine is inapplicable, and the third assignment of error is overruled.

### D. Sufficiency and Manifest Weight of the Evidence

**{¶86}** In the fourth assignment of error, Salti argues his convictions are not supported by sufficient evidence. In the fifth assignment of error, he argues his convictions are against the manifest weight of the evidence.

**{¶87}** Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶88}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶89}** In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at

386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶90} Salti was convicted of eight counts of rape in violation of R.C. 2907.02(A)(2), eight counts of kidnapping in violation of R.C. 2905.01(A)(4), six counts of extortion in violation of R.C. 2907.21(A)(2)(a), one count of compelling prostitution in violation of R.C. 2907.21(A)(2)(a), and one count of gross sexual imposition in violation of R.C. 2907.05(A)(1).

{¶91} To prove rape in violation of R.C. 2907.02(A)(2), the state had to prove that Salti "engage[d] in sexual conduct with another" and "purposely compel[led] the other person to submit by force or threat of force." R.C. 2907.01(A) defines "sexual conduct," in relevant part, as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so[.]" Although fellatio is not defined in the Revised Code, the Ohio Supreme Court has defined it as "'the practice of obtaining sexual satisfaction by oral stimulation of the penis.'" *In re M.D.*, 38 Ohio St.3d 149, 152, 527 N.E.2d 286 (1988), quoting *Webster's Third New International Dictionary* 836 (1986).

{¶92} "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome

by fear or duress, the forcible element of rape can be established." *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

{¶93} To prove kidnapping in violation of R.C. 2909.01(A)(4), the state had to prove that Salti removed the victim from the place where the victim was found or restrained the victim's liberty "by force, threat, or deception" in order [t]o engage in sexual activity * * * with the victim against the victim's will." R.C. 2907.01 defines "sexual activity" as "sexual conduct or sexual contact, or both." The jury further found that the victims of four of the kidnapping convictions were under 18 years of age at the time the offenses were committed.

{¶94} Compelling prostitution in violation of R.C. 2907.21(A)(2)(a) required the state to prove that Salti "knowingly d[id] any of the following: Induce, procure  encourage, solicit, request, or otherwise facilitate either of the following: A minor to engage in sexual activity for hire, whether or not the offender knows the age of the minor."

{¶95} And to prove gross sexual imposition in violation of R.C. 2907.05(A)(1), the state had to prove that Salti had sexual contact with another not his spouse by purposely compelling the other to submit by force or threat of force. R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶96} Finally, Salti was charged with seven counts of extortion in violation of R.C. 2905.11(A)(5). R.C. 2905.11(A)(5) states, in relevant part:

> No person, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, shall * * * [e]xpose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal or business repute, or to impair any person's credit.

The seven counts of extortion allege that Salti

> did, with purpose to induce another to do an unlawful act[,] expose or threaten to expose any matter tending to subject [the victim] to hatred, contempt, or ridicule, or to damage her personal or business report, or to impair her credit.

**{¶97}** The purposes of an indictment are to give an accused adequate notice of the charge and enable an accused to be protected from any future prosecutions for the same incident. *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, citing *Weaver v. Sacks*, 173 Ohio St. 415, 417, 183 N.E.2d 373 (1962), and *State v. Sellards*, 17 Ohio St.3d 169, 170, 478 N.E.2d 781 (1985). An indictment that tracks the language of the charged offenses, identifies the predicate offenses by statute number, and includes each element of the predicate offenses provides the accused with adequate notice of the pending charges. *Id.*; *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26.

**{¶98}** Although the seven counts of extortion allege that Salti violated R.C. 2905.11(A)(5), none of the allegations in the indictment included the language from the statute prohibiting extortion "with purpose to obtain any valuable thing or valuable benefit." The bill of particulars also makes no mention of this language. Thus, Salti was not provided notice that the state intended to prove that Salti committed extortion by threatening to expose any matter tending to subject the victims to hatred, contempt, or ridicule, or to damage any victim's personal or business repute "with purpose to obtain any valuable thing or valuable benefit." Therefore, in order prove extortion as alleged in Counts 4, 8, 13, 20, 25, 27, and 30 of the indictment, the state had to prove that Salti committed extortion in order "to induce another to do an unlawful act."

### 1. Offenses Committed Against K.K.

**{¶99}** Salti was convicted of two counts of rape, one count of kidnapping, and one count of extortion against K.K. With respect to the rape offenses, K.K. testified that Salti put a belt around her neck and threatened to kill her if she failed to perform oral sex on him. K.K. did not know Salti or what he was capable of, and thus felt compelled to comply with his demands out of fear of serious physical harm. Therefore, there was sufficient evidence of the rape alleged in Count 1.

**{¶100}** The second rape, alleged in Count 2, occurred when a second, unidentified man forced K.K. to perform oral sex on him while Salti stood by and recorded the rape on his phone. Although Salti did not physically participate in the second rape, he was complicit in the act of the other man. In Ohio, there is no difference between those convicted of complicity in a crime and the principal offender. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 247.

**{¶101}** To establish criminal liability under the complicity statute, R.C. 2923.03(A)(2), the evidence must show that "the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. The defendant's intent may be inferred from the surrounding circumstances. *Id*.

**{¶102}** K.K. testified that Salti facilitated the commission of the second rape by the other man. He ordered her to close her eyes while the other man approached her and forced her mouth open. K.K. was still under the threat of harm Salti made when he threatened to kill her if she resisted, and he remained in the room to enforce the threat during the second rape. Therefore, there was sufficient evidence that Salti was complicit in the commission of the rape by the second

man.  And the constant threat of deadly force used to restrain K.K. during the commission of the rapes provided sufficient evidence to support Salti's kidnapping conviction against K.K.

{¶103} Finally, K.K. testified that in the days following the rapes, Salti texted her and threatened that if she was not a "good girl," he would tell her parents what she had done.  Salti used graphic photos of K.K. performing oral sex to induce fear and compliance.  Publishing photos of K.K. performing oral sex on the internet would expose K.K. to contempt and ridicule and would damage her reputation.  However, there is no evidence that Salti threatened to do these things to induce K.K. to commit an unlawful act.  Therefore, there was insufficient evidence of extortion as alleged in Count 4 of the indictment.

{¶104} Salti argues that K.K.'s testimony was not credible because she never mentioned the rape in any subsequent texts, but told Salti: "I don't want to do this anymore."  Salti claims this text is indicative of a person seeking to "disengage from a relationship, not one between a victim and her rapist."  (Appellant's brief at 26.)  Salti also notes that K.K. made inconsistent statements to the nurse at the hospital regarding the day she was allegedly assaulted.

{¶105} However, threatening texts from Salti's phone aimed at keeping K.K. silent about the rapes were admitted into evidence, and they corroborate K.K.'s testimony.  K.K.'s sister also corroborated K.K.'s testimony when she described how K.K.'s demeanor had changed following her return from her "interview" at Max & Grady's:

> She was wearing a dress that day.  * * *  And her back of her dress was rolled up, her hair was all messed up, and she was stumbling all over the place like she was intoxicated.

> My first reaction was to go over to run to her to see if she was okay. I asked her what happened and her response to me was, I don't want to talk about it.  * * * She did not want to talk about the event that happened.

[T]he next day * * * I asked her how was the interview because that evening she said she didn't want to talk about it. * * * [S]he was hesitant on telling me anything about it, which made me very worried * * * I kept pushing the issue, like why won't you tell me what happened at the interview? * * * And I told her I was really concerned. I said, I'm worried about you. Why won't you tell me what happened at this interview and that's when she broke down crying and told me details of the event.

(Tr. 595.)

{¶106} The jury was in the best position to evaluate the witnesses' credibility, and there was substantial, credible evidence, in addition to K.K.'s testimony, that indicated she was raped and extorted by Salti. Therefore, there was sufficient evidence to support the two rape convictions and one kidnapping conviction alleged in Counts 1, 2, and 3 of the indictment. However, there was insufficient evidence to support the extortion conviction alleged in Count 4 due to the language used in the indictment.

### 2. Offenses Committed Against Becky

{¶107} Salti was convicted of one count of rape, one count of kidnapping, and one count of extortion against Becky. The jury further found that Becky was under 18 years of age when Salti committed the kidnapping offense against her.

{¶108} Becky testified that Salti vaginally raped her when she went to his house to retrieve her Facebook password. In describing the rape, Becky stated that Salti pushed her into a bedroom, put his hand over her mouth, and forcibly removed her clothes in order to effect the rape. Thus, there was evidence that Salti restrained Becky's liberty for the purpose of engaging in sexual activity. Furthermore, Becky testified that she was 17 years old at the time of the rape and kidnapping. (Tr. 567.) Therefore, there was sufficient evidence that Salti raped and kidnapped Becky when she was under 18 years of age.

**{¶109}** With respect to extortion, Becky testified that Salti, who had previously asked Becky to prostitute for him, threatened to publish naked pictures of her to her family and friends in order to induce compliance. Thus, there was sufficient evidence that Salti threatened to expose matter tending to damage Becky's reputation to compel her to engage in the unlawful act of prostitution. Therefore, there was sufficient evidence to support Salti's rape, kidnapping and extortion convictions against Becky as alleged in Counts 5, 7, and 8.

**{¶110}** Salti nevertheless contends Becky's testimony was not credible because she could not remember the exact date and time when the rape and kidnapping occurred, and she did not report the crimes to the police. However, it is understandable that Becky could not remember the exact date of the offenses since they occurred five or six years before trial. And Becky remembered several details about the house where the rape occurred, including its location on Cohassett Avenue in Lakewood and the layout of the house. She also remembered the time of year in which the events occurred, testifying that it occurred sometime between September and November of 2011 or 2012. The jury was in the best position to assess Becky's testimony, and we find nothing in the record to indicate that her testimony lacked credibility. Therefore, Salti's rape, kidnapping, and extortion convictions against Becky were supported by sufficient evidence and by the manifest weight of the evidence.

### 3. A.M.

**{¶111}** Salti was convicted of one count of kidnapping, one count of compelling prostitution, and one count of extortion against A.M. as alleged in Counts 11-13 of the indictment. The jury further found that A.M. was under 18 years of age when the kidnapping occurred.

**{¶112}** A.M. testified that she engaged in prostitution for Salti three times when she was 15 or 16 years old. All three times, Salti drove A.M. to the house where the prostitution

occurred and received money from the "client." (Tr. 406-408.) Therefore, there was sufficient evidence that Salti knowingly encouraged and requested that A.M. engage in sexual activity for hire.

{¶113} A.M. testified that although she engaged in prostitution on three occasions, she only consented the first time. (Tr. 407.) When Salti transported A.M. to the house for prostitution the second and third times, he was moving her from the place where she was found, against her will, for the purpose of sexual activity. Further, Salti threatened to publish videos of A.M. performing oral sex to her family if she refused to comply. Therefore, there was sufficient evidence to support Salti's kidnapping conviction alleged in Count 11, which he committed against A.M., who was under 18 years old at the time of the offense.

{¶114} Nevertheless, Salti argues there was insufficient evidence to support his extortion conviction relative to A.M. because there was no evidence that he "blackmailed" her in order to induce her to commit an unlawful act. However, Salti made videorecordings of A.M. performing oral sex and threatened to show the videos to her family and friends if she failed to prostitute for him. (Tr. 411.) Prostitution is an unlawful act. R.C. 2907.25(A). Therefore, there was sufficient evidence to support Salti's kidnapping, extortion, and compelling prostitution convictions as alleged in Counts 11-13.

{¶115} Salti also contends there is insufficient evidence to support his compelling prostitution conviction because it is unclear from A.M.'s testimony whether the prostitution occurred in Cuyahoga County or somewhere else. However, venue is not a material element of the offense charged. *State v. Webster*, 8th Dist. Cuyahoga No. 102833, 2016-Ohio-2624, ¶ 79. Although venue is a fact that must generally be proved in criminal prosecutions, Salti apparently

waived any challenge to venue by failing to raise the issue in the trial court. *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983) (Venue may be waived by a criminal defendant.).

{¶116} Therefore, there was sufficient evidence to support the kidnapping, compelling prostitution, and extortion convictions against A.M., alleged in Counts 11, 12, and 13.

{¶117} Salti contends his convictions on Counts 11, 12, and 13 are against the manifest weight of the evidence because A.M.'s testimony was not credible. He contends she gave vague answers and did not remember the exact location where the prostitution occurred. However, A.M. testified that each of the three acts of prostitution occurred in the same house with the same "client." It is not surprising that A.M. could not remember the exact location of the house because the prostitution occurred when she was 15 years old, and she was 24 years old at time of trial. (Tr. 403.) More importantly, A.M. remembered that the prostitution occurred three times and that she only agreed to engage in prostitution once. As previously stated, the jury was in the best position to assess her credibility, and we find nothing in the record to suggest that her testimony was not reliable.

### 4. G.E.

{¶118} Salti was convicted of two counts of rape, two counts of kidnapping, and one count of extortion against G.E. Salti contends there was insufficient evidence to support these rape and kidnapping convictions because G.E. agreed to meet Salti for sex on both occasions. However, with respect to the first rape, G.E. agreed to meet Salti at Walgreens for a date. Instead of a friendly date, Salti grabbed her from behind while wearing a mask, held a knife to her throat, and put his penis in her vagina against her will. Therefore, there was sufficient evidence of rape and kidnapping convictions alleged in Counts 21 and 22.

**{¶119}** Regarding the second incident, G.E. agreed to perform oral sex on a man she believed to be Salti's associate because she feared Salti was going to inflict serious physical harm on her and her family. G.E. and J.C.1 "agreed" to perform oral sex on Salti's associate in exchange for an end to Salti's threats. G.E. explained:

A: We kind of just decided to band together to make this stop.

Q: Make what stop?

A. The harassment.

Q: How did he harass you?

A: Calling me constantly, texting me constantly, threatening to have like black guys come to my house and rape and kill me.

* * *

Q: What did you guys agree to do? What were the terms?

A: Well, we talked with him on the phone and we didn't want it to be Raed. And he said he promised it was going to be someone else we were meeting up with. We just kind of like, can we just get this over with, because we're afraid — we're paranoid, afraid to leave our house because of getting like attacked or something, even worse. He knew where I lived. I was scared for my family too. I didn't know what to do.

(Tr. 482, 484.) G.E. explained that she did not report the first rape to the police because she thought she would be "blamed" since she agreed to meet Salti at the Walgreens. (Tr. 480-481.)

**{¶120}** As previously stated, the force necessary to support a rape conviction "need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Fowler*, 27 Ohio App.3d 149 at 154, 500 N.E.2d 390. The constant threat of violence caused G.E. and J.C.1 to "agree" to perform oral sex on a stranger behind a Walgreens

store.  Then, during the encounter, G.E. and J.C.1 recognized the stranger as Salti, and Salti threatened them by brandishing a firearm and a knife.  (Tr. 487.)  G.E. explained:

> He had — he brought out the knife from his pocket and had put me on my knees and just kind of dragged the knife over my face and cheek and neck and saying stuff like, I think Becky wants me to cut you.

(Tr. 487.)  Therefore, there was sufficient evidence that Salti engaged in sexual conduct with G.E. against her will and that he used the threat of force to compel her submission.  Therefore, there was sufficient evidence to support the rape and kidnapping convictions alleged in Counts 23 and 24.

{¶121} Salti was also convicted of one count of extortion against G.E.  However, there is no evidence that Salti threatened to expose any matter that would subject G.E. to hatred, contempt, ridicule, or damage to her reputation in order to induce her to commit an unlawful act. Therefore, there is insufficient evidence to support Salti's extortion conviction relative to G.E. as alleged in Count 25 of the indictment.

{¶122} Salti makes no argument as to why his convictions relative to G.E. are against the manifest weight of the evidence.  As previously stated, the jury was in the best position to assess her credibility, and we find nothing in the record to suggest that her testimony was not reliable. Therefore, Salti's rape and kidnapping convictions alleged in Counts 21-24 are supported by the manifest weight of the evidence.

### 5. J.C.1

{¶123} Salti was convicted of two counts of rape, two counts of kidnapping, and one count of extortion against J.C.1.  The jury further found that J.C.1 was under 18 years of age relative to one of the kidnapping counts.  With respect to the first set of rape and kidnapping counts alleged in Counts 16 and 17, J.C.1 testified that she met Shawn, later identified as Salti, for a date, and he

took her to a room inside a Mobile Boost store where he forced her to perform oral sex. Although the oral sex was consensual at first, she wanted it to stop because Salti had become aggressive and put his hands on her throat. She told him she did not want to go any further, but he held her head down and forced her to continue performing oral sex until he ejaculated. (Tr. 533, 549.) Thus, Salti forced J.C.1 to perform oral sex on him after she withdrew her consent. He also used force to restrain her liberty for the purpose of engaging in sexual activity. Therefore, there was sufficient evidence to support these convictions.

{¶124} With respect to the second counts of rape and kidnapping alleged in Counts 18 and 19, J.C.1 testified that Salti raped her behind the Walgreens when she and G.E. thought they were meeting one of Salti's associates. She felt compelled to perform oral sex on the person, who turned out to be Salti, because Salti had been continually threatening to shoot up her house. Then, at the scene, Salti demonstrated additional force with the use of his gun and knife. (Tr. 527.) As previously stated, the constant threat of physical harm was the motivating force that caused J.C.1 and G.E. to meet Salti at the Walgreens. Once they were there, Salti used the threat of physical force to compel their submission. Therefore, there was sufficient evidence to support these convictions.

{¶125} Finally, Salti was convicted of one count of extortion against J.C.1. However, there is no evidence that Salti threatened to expose any matter that would subject J.C.1 to hatred, contempt, ridicule, or damage to her reputation in order to compel her to commit an unlawful act. Therefore, there is insufficient evidence to support Salti's extortion conviction relative to J.C.1 as alleged in Count 20 of the indictment.

{¶126} There is also insufficient evidence to support the furthermore finding that J.C.1 was under 18 years of age at the time Salti committed the kidnapping alleged in Count 17. J.C.1

testified that the second rape occurred in March 2016, and that she was born in January 1998. (Tr. 507, 524.)   Therefore, the jury properly found that J.C.1 was over 18 years of age when the second rape and kidnapping occurred.   J.C.1 testified that she met "Shawn" sometime after she started using MeetMe, when she was 16 years old.   Although the first rape occurred sometime before March 2016, there is no evidence of the date when the first rape occurred.   Therefore, there was insufficient evidence to support the jury's finding that J.C.1. was under 18 years old when the first rape and kidnapping occurred.   However, there was sufficient evidence to support the two counts of rape, two counts of kidnapping of person 18 years or older, and one count of extortion against J.C.1. as alleged in Counts 16-19.

{¶127} Salti makes no argument as to why his convictions relative to J.C.1 are against the manifest weight of the evidence, and we find nothing in the record to suggest that her testimony was not reliable.

## 5.   J.C.2

{¶128} Salti was convicted of one count of gross sexual imposition against J.C.2.   As previously stated, to prove gross sexual imposition in violation of R.C. 2907.05(A)(1), the state had to prove that Salti had sexual contact with J.C.2, who was not his spouse, by purposely compelling the other to submit by force or threat of force.   He contends there is insufficient evidence to support this conviction because there was no evidence of force or threat of force.

{¶129} R.C. 2901.01 defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."   Salti argues there was no evidence of force because there was no evidence of a threat of violence.   However, R.C. 2901.01 defines force as "any violence, compulsion *or* constraint."   (Emphasis added.)   Therefore, force may be established without physical violence.   Indeed, the statute provides that force may be

established by physical constraint "by any means," which suggests the constraint does not require either violence or a threat of violence.

{¶130} Salti's act of taking J.C.2's hand and moving it to his groin was an act of physical constraint exerted on J.C.2. When asked if she touched Salti's penis on her own, her answer was "absolutely not." (Tr. 617.) Thus, she did not place her hand on Salti's penis of her own volition. The only reason J.C.2's hand came into contact with Salti's penis was because Salti forced it there. Therefore, there was sufficient evidence to support Salti's gross sexual imposition conviction.

{¶131} Although Salti asserts his gross sexual imposition conviction was against the manifest weight of the evidence, he again offers no argument to support this claim. Moreover, J.C.2 testified that she reported the incident to police, and Biegacki corroborated her testimony to that effect. After reviewing J.C.2's testimony, we find no reason to question its reliability. Therefore, Salti's gross sexual imposition conviction is supported by the manifest weight of the evidence.

### 7. J.F.

{¶132} Salti was convicted of one count of extortion against J.F., in violation of R.C. 2905.11(A)(5). He contends there was no evidence to support his extortion conviction against J.F. because there was no evidence that he "blackmailed" her in order to induce her to do an unlawful act. However, J.F. testified that Salti threatened that if she did not become a prostitute or meet him in a hotel for sex, he was going to send naked pictures of her to her friends and family or post them on social media. (Tr. 758-759.) Thus, there was sufficient evidence that Salti threatened to expose any matter tending to damage J.F.'s reputation in order to induce her to commit the unlawful act of prostitution as alleged in Count 27 of the indictment.

## 8. C.L.

{¶133} Finally, Salti was convicted of one count of rape, one count of kidnapping, and one count of extortion against C.L. C.L. testified that Salti raped her after she ended their relationship, and he was unwilling to accept the rejection. She stated that she went to Salti's apartment to retrieve a cat she had rescued because she feared Salti would hurt it. When she insisted their relationship was over, Salti became aggressive. C.L. testified:

> Q: So what happens when you go to the apartment?
>
> A: It was a typical, I want you to stay with me, oh, things will change. I didn't want to hear it and I was not really interested in that. I was trying to build it so I could get to the point I just want to leave with this cat and move on. And that's when he started to attack me and held me down.
>
> I was forced on my stomach on the bed as he tried to rip my pants off of me and he smashing my head against the wall. There was like a piece of furniture I had hit my head against and he forced my pants finally off of me, like grabbing the back of my head and my neck, my hair, and sexually assaulted me, penetrated me while he was telling me I'm worthless and this is my fault and continually screaming at me.

(Tr. 365.) This testimony is sufficient evidence of Salti's rape and kidnapping convictions relative to C.L.

{¶134} With respect to the extortion conviction, C.L. testified that Salti harassed her for the next six or seven years after the rape. He repeatedly showed up unannounced where C.K. worked and threatened to tell her employer things to get her fired if she did not agree to continue a romantic relationship with him. (Tr. 382.) However, there is no evidence that Salti threatened to expose C.L. to ridicule and damage to her reputation in order to get her to commit an unlawful act. Therefore, there was insufficient evidence to support Salti's extortion conviction relative to C.L. as alleged in Count 30.

{¶135} Salti argues C.L.'s testimony was not credible because she declined to make a report of the rape even though she called the police, and they came to her door. However, C.L. testified that she was afraid to report the rape until after Salti was incarcerated. He continually harassed and stalked her, even showing up at her place of employment after she changed jobs. (Tr. 372.) Therefore, it is not unreasonable that C.L. decided not to report the rape to police out of fear of retaliation from Salti. Moreover, the jury was in the best position to assess C.L.'s credibility. Therefore, the rape and kidnapping convictions relative to C.L., as alleged in Counts 28 and 29 were supported by the manifest weight of the evidence.

{¶136} The fourth and fifth assignments of error are sustained in part and overruled in part. We sustain the fourth and fifth assignment of error with respect to Salti's extortions convictions relative to K.K., G.E., J.C.1, and C.L. as alleged in Counts 4, 20, 25, and 30. We also sustain the fourth and fifth assignments of error with respect to the furthermore finding that J.C.1 was under 18 years of age as alleged in Count 17.

{¶137} The trial court's judgment is affirmed in part and reversed in part. We reverse Salti's extortion convictions relative to K.K., G.E., J.C.1, and C.L. alleged in Counts 4, 20, 25, and 30 and the furthermore finding that J.C.1 was under 18 years of age as alleged in Count 17. The remaining convictions are affirmed.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

MARY EILEEN KILBANE, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR